ANTONIA M. APPS
REGIONAL DIRECTOR
THOMAS P. SMITH, JR.
SANDEEP SATWALEKAR
REBECCA REILLY
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
(212) 336-0051 (Reilly)
Reillyre@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　-against-<br><br>MATTHEW MELTON,<br><br>　　　　　　　　　　Defendant. | **COMPLAINT**<br><br>23 Civ. _____ (     )<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Matthew Melton ("Melton" or the "Defendant"), alleges as follows:

### SUMMARY

1. This civil enforcement action concerns securities law violations by Melton in connection with his solicitation of investments in Price Physics LLC ("Price Physics").

2. From at least April 1, 2018 through October 31, 2020 (the "Relevant Period"), Melton, by targeting prospective investors who shared an affinity for the outdoors, solicited over $3.4 million from at least 23 investors.

3. Melton told investors he would profitably trade stock index futures using the Price Physics trading algorithm that had purportedly generated consistent returns of 12% per month.

4. Investors signed a "loan agreement" or "promissory note," each of which constituted securities, and sent funds directly to Melton's personal bank accounts where the funds were commingled with other investor funds.

5. Rather than use the investment proceeds as promised, Melton misappropriated over $1.5 million of investor funds to make Ponzi-like payments to investors and to pay for his personal expenses.

6. Melton also lied to prospective and existing investors, whom he continued to solicit, regarding the performance of the Price Physics algorithm.

## VIOLATIONS

7. By virtue of the foregoing conduct and as alleged further herein, Melton has violated Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b) and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8. Unless Melton is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9. The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

10. The Commission seeks a final judgment: (a) permanently enjoining Melton from violating the federal securities laws and rules this Complaint alleges he has violated; (b) permanently enjoining Melton from directly or indirectly, including, but not limited to, through any entity owned or controlled by Melton, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Melton from purchasing or selling securities with his own personal assets for his own personal accounts; (c) permanently prohibiting Melton from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; (d) ordering Melton to disgorge all ill-gotten gains he received as a result of the violations alleged herein pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)], and to pay prejudgment interest thereon; (e) ordering Melton to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and (f) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

12. Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

13. Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)]

3

and Exchange Act Section 27 [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York, including, for example, transactions with investors involving banks located in this District.

## DEFENDANT

14. **Melton**, age 59, resided in Puerto Rico between approximately April 2018 and October 2020.  Melton formed Price Physics in May 2017.  In approximately April 2018, Melton relocated from Colorado to Puerto Rico and began actively soliciting investments in Price Physics.

## OTHER RELEVANT ENTITIES

15. **Price Physics** is a Colorado limited liability company formed in May 2017.  The Colorado Secretary of State's website lists Price Physics status as "Delinquent October 1, 2018."  Price Physics was registered in Puerto Rico in January 2020.

## FACTS

### I. Background

16. In approximately April 2018, Melton began soliciting investments in Price Physics from residents of Puerto Rico and elsewhere who shared an affinity for outdoor sports like hiking, biking, and sailing.

17. Melton organized excursions and used the outings as an opportunity to meet prospective investors and present himself as a computer specialist who had designed a highly successful proprietary trading algorithm to trade stock market futures index contracts (e.g., E-mini S&P 500 futures, E-mini Dow Jones futures, and E-mini NASDAQ futures).

18. Melton hosted pool parties for existing and prospective investors and also took them out on his 38-foot sailboat named "Pretty Girl."

19. In January 2019, Melton invited four investors to join him on a self-described "Investor Catamaran Trip."

20. In September 2020, Melton organized a sailing trip for 15 investors in Italy.

21. Melton touted Price Physics as an exclusive opportunity and told many existing and prospective investors that there was a 15-person limit on the number of permitted investors.

22. In fact, Melton solicited investments from a broader group of individuals.

23. Melton represented that he would use investor money to trade using the Price Physics algorithm.

24. Based on Melton's representations, investors understood that their money would be pooled together for trading by Melton.

25. Melton told investors the Price Physics algorithm had generated consistent gains of 12% per month and promised investors between 8% and 10% of the returns, with Melton generally retaining the remaining 2%-4%.

26. Individuals were motivated to invest based on Melton's promises regarding monthly returns.

27. The majority of investors signed a one-page "loan agreement" and sent funds directly to Melton's personal bank accounts.

28. The loan agreements represented that investor funds "will be used to generate capital gains via the automated mechanisms developed under the name Price Physics" and promised returns of 10% per month. Some later in time investors were promised returns of 8% per month.

29. The loan agreements further represented that "the proceeds of those gains will fund the loan [re]payments" and that, "in the event that the Price Physics program is unable to

generate at least this level of return, both parties will have to alter this loan agreement at a future date."

30. Some of the loan agreements were signed "Matthew Melton DBA Price Physics."

31. Loan agreements signed later in the Relevant Period dropped references to Price Physics, its automated mechanisms, the generation of capital gains, and expected returns.

32. However, investors continued to understand based on Melton's representations that their money would be used by Melton to trade and that the trading would fund investor returns.

33. In January 2019, Melton told one prospective investor ("Investor A") that, because he could only have a limited number of investors in Price Physics, Investor A should invest through another Price Physics investor ("Investor B"), by signing a loan agreement with Investor B.

34. Upon receiving the draft loan agreement, Investor A suggested that a promissory note was more apt than a loan agreement because, "due to the nature of the investment, if the principal was ever to be hurt, holding Investor B personally responsible doesn't seem fair."

35. Thereafter, Investor A and Investor B executed a promissory note (the "Note") which stated that the borrower would pay the lender a "loan fee" of 8% on a monthly basis and that the loan fee is "subject to the success of the trading algorithm."

36. Following execution of the Note, Investor A wired the investment money to one of Melton's personal bank accounts ("Bank Account A").

37. Subsequent investments by Investor A were similarly structured, and, in total, the investor sent $200,000 directly to Melton's personal bank accounts.

38. At all relevant times, Melton maintained at least 10 personal bank accounts, six

brokerage accounts, three online money transfer accounts, and one customer account on a crypto asset platform.

39. Investor funds, including Investor A's funds, were pooled within Melton's bank and brokerage accounts.

40. Based on Melton's representations, investors understood that they were investing money in order to obtain a return based on Melton's efforts to generate profits through his use of the Price Physics algorithm.

41. No alternative regulatory scheme or risk-reducing factors existed to protect investors with respect to their investments in Price Physics.

42. The aforementioned loan agreements and Note constituted securities.

43. Total gross investor inflows into these accounts were over $3.4 million from at least 23 investors.

44. While Melton maintained one bank account in the name of Price Physics, the account did not receive investor funds during the Relevant Period and, from July 31, 2018, the bank account had a $0 balance.

45. Between 2018 and mid-2019, investors received consistent returns funded either by their initial investments or subsequent investor funds.

46. By late 2019, Melton reduced monthly disbursements, telling investors that various market issues, such as a lack of volatility, too much volatility, and banking troubles were to blame. Around this time, Melton's monthly updates became sporadic and, eventually, the updates, as well as disbursements to most investors, stopped.

47. After disbursements ceased, many investors became angry and demanded their money back.

48. Notwithstanding his inability to pay returns or refunds to existing investors, Melton continued to actively solicit new investors in Price Physics through July 2020.

49. Upon information and belief, Melton left the United States in October 2020.

50. In approximately October 2020, Melton stopped communicating with most investors.

## II. Misrepresentations About Using Investor Money to Trade Futures

51. Melton told prospective investors he would use their money to trade futures using the Price Physics algorithm but he only sent a portion (i.e., about half) of the $3.4 million solicited to brokerage firms from the bank accounts receiving investor money.

52. Melton engaged in brokerage transactions that appeared to lack any economic purpose. As depicted below, between January 2, 2019 and January 11, 2019, Melton transferred funds into and out of one brokerage account ("Brokerage Account A") without engaging in substantial trading:

| Date | Transaction |
|---|---|
| 1/2/19 | $12,000 ACH transfer from Melton bank account ("Bank Account B") to Brokerage Account A |
| 1/2/19 | $10,000 ACH transfer from Brokerage Account A to Bank Account A |
| 1/4/19 | $12,000 ACH transfer from Bank Account B to Brokerage Account A |
| 1/4/19 | Options purchases totaling $1,884 |
| 1/7/19 | Options sales totaling $2,450.  Options purchases totaling $594 |
| 1/10/19 | $10,000 ACH transfer from Brokerage Account A to Bank Account A |
| 1/11/19 | $5,000 ACH transfer from Brokerage Account A to Bank Account A |

53. Further, contrary to what Melton told investors, he sometimes traded options (not futures).

## III. Misrepresentations and Omissions Relating to Performance of the Algorithm

54. Melton's trading was consistently unprofitable. Specifically, his trading yielded net profits in only five months (i.e., May 2018, March 2019, May 2019, December 2019, and

September 2020) of the 30-month Relevant Period

55. Across the Relevant Period, Melton's trading resulted in net losses of over $1 million.

56. Melton repeatedly made material misstatements concerning the performance of the Price Physics algorithm to prospective and existing investors. For example, in February 2019, Melton told Investor A that he was already making 12% monthly with the algorithm; however, the Price Physics algorithm never generated this level of returns.

57. When asked by Investor A why he needed investors if he was already making 12%, Melton told Investor A it was because he had just gotten divorced and had given his wife everything, including all his cash.

58. Following this conversation, Investor A made an initial investment of $50,000 and three subsequent investments totaling $150,000 (for a total investment amount of $200,000, all of which was sent directly to the Bank Account A).

59. Melton's updates to investors were disjointed, confusing, and contained lies concerning, among other things, the algorithm's performance.

60. For example, in a January 2019 update, Melton told investors that Price Physics trading was "all good as it cleared the 12% per contract." In fact, Melton's trading was not profitable during the December 2018 and January 2019 time period.

61. In a June 2019 update, Melton told investors, "On the trading front, things are good in general" when, in reality, he was not earning the projected returns.

62. In a May 2020 update, even as his trading had not produced gains for months and many investors had stopped receiving returns, Melton falsely told some investors that in May, "we DID have the best month of 2020, but it was 2/3 [or] 66% not the 75% that I communicated

9

to a few of you."

63. Melton made similar misrepresentations and omissions to investors in person and over the phone.

64. Upon receiving Melton's updates, some investors made additional investments in Price Physics.

65. For example, after receiving Melton's June 2019 update on June 9, 2019, one investor ("Investor C") invested an additional $200,000 on June 20, 2019 (having already invested $100,000 on December 26, 2018 and $200,000 in February 22, 2019).

66. Another investor ("Investor D"), also invested an additional $200,000 on June 13, 2019 following his receipt of the June 2019 update on June 9, 2019. Investor D had previously invested a total of $300,000 ($100,000 on October 2, 2018, $100,000 on December 7, 2018, and $100,000 on February 20, 2019).

### IV. Misappropriation of Investor Funds

67. Contrary to Melton's representations that he would use their money for trading, Melton misappropriated over $1.5 million of investor money to make Ponzi-like payments to Price Physics investors and for his personal use.

68. Upon receiving an investor deposit, Melton often transferred the funds from his personal bank accounts to his online money transfer accounts, and then from his online money transfer accounts out to different investors.

69. Melton also transferred money directly from his personal bank accounts to investors.

70. Melton also misappropriated investor money for personal use. For example, during the Relevant Period, Melton used over $621,000 from Bank Account A for personal

expenses such as mortgage payments ($33,710); airline travel ($22,942); hotels and short-term rentals ($22,160); college tuition ($13,365); car payments ($8,482); and sailing activities ($5,483).

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)

71. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 70.

72. Melton, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

73. By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

74. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 70.

75. Melton, directly or indirectly, singly or in concert, in connection with the

purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (1) employed one or more devices, schemes, or artifices to defraud, (2) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

76. By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Defendant and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Permanently enjoining Defendant from directly or indirectly, including, but not limited to, through any entity owned or controlled by Defendant, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities with his own personal assets for his own personal accounts;

**III.**

Permanently prohibiting Defendant from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

**IV.**

Ordering Defendant to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the conduct alleged in this Complaint pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)];

## V.

Ordering Defendant to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

## VI.

Granting any other and further relief this Court may deem just and proper.

### JURY DEMAND

The Commission demands a trial by jury.

Dated: New York, New York
November 15, 2023

                                                  __/s/ Antonia M. Apps_____
ANTONIA M. APPS
REGIONAL DIRECTOR
Thomas P. Smith, Jr.
Sandeep Satwalekar
Rebecca Reilly
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
(212) 336-0051 (Reilly)
ReillyRe@sec.gov